Submitted on record and briefs December 12, 2006, reversed April 18, 2007

In the Matter of
M. C. M.,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

M. C. M.,
*Appellant.*

Multnomah County Circuit Court
050969437; A130191

157 P3d 308

Lance D. Perdue filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Laura S. Anderson, Senior Assistant Attorney General, filed the brief for respondent.

Before Edmonds, Presiding Judge, and Haselton and Wollheim,* Judges.

EDMONDS, P. J.

---

* Wollheim, J., *vice* Richardson, S. J.

## EDMONDS, P. J.

Appellant appeals from an involuntary mental commitment pursuant to ORS 426.130. On appeal, he argues that (1) the trial court erred in finding by clear and convincing evidence that he is a mentally ill person as defined by ORS 426.005(1)(d), and (2) even if the evidence is sufficient to support the trial court's finding in that regard, the court erred when it concluded that he was unwilling, unable, or unlikely to participate in treatment on a voluntary basis.[1] On *de novo* review, we reverse.

■       The trial court concluded that appellant was dangerous to himself because of his mental disorder. It explained, "based upon his presentation today and general lack of insight and judgment into his situation, there is an immediate risk of death or serious physical injury." Based on our review of the record, we are persuaded that, because of his mental disorder, appellant lacked the insight at the time of the hearing to appreciate the danger that his past behavior had put him in and to stay out of harm's way.

■       We turn next to appellant's argument under ORS 426.130(1)(b)(A) and whether his mental status at the time of the hearing necessitated involuntary commitment. Appellant correctly asserts that the trial court "gave no reason why [it] was satisfied Appellant would probably not [comply with voluntary treatment]." Appellant's case manager testified *that, although appellant had increasingly become more agitated in the recent past and had been involved in serious confrontations with others, his present condition was improving and that appellant presented no "triggers" that would cause the case manager to fear working with him. Indeed, the case manager testified that appellant was "pretty mellow right now."

It appears that the trial court's major concern was that appellant would be evicted from the care facility in

---

[1] ORS 426.130(1)(b)(A) provides that the court must release the mentally ill person and dismiss the case if the person is willing and able to participate in treatment on a voluntary basis and the court finds that the person will probably do so.

which he lived, if released, and become homeless. The trial court at one point during the hearing said to appellant,

> "Why don't you let me let you stay in the hospital for at least another week so that you can get this worked out, so that Mr. Harris [appellant's case manager] will have a chance to maybe help you find housing and get this transfer of your stuff and so you'll have a place to stay, a bed tonight[.]"

But as appellant's counsel pointed out to the court, "the fact that he's homeless isn't a reason * * * for this Court to hold him under a civil commitment[.]"

In fact, the evidence demonstrated that appellant would receive a social security check of $578 within the next several days and would then be able to rent a room. In the interim, appellant testified, he could contact the Salvation Army or a friend and obtain temporary housing. Moreover, appellant testified that he would continue taking the medications prescribed for him by his primary care provider, that he had medications at home that he could take, and that he would follow "the advice of the doctors."

Regardless of which party has the burden of proof under ORS 426.130(1)(b), the above evidence preponderates in favor of the conclusion that appellant was willing to participate in voluntary treatment. Indeed, he was adamant that he did not want to be hospitalized; rather, he wanted to be released so that he could return and continue to be treated by his own doctor.

The closer question based on the record before us is whether, in light of appellant's mental status, as of the time of the hearing, he was capable of participating in treatment on a voluntary basis. However, appellant presented an objectively viable plan to provide for his own welfare, including remaining under the care of his primary physician, continuing to take medication prescribed for his mental disorder, and obtaining housing once his social security check arrived.[2] Also, he expressed a realistic plan for obtaining temporary shelter until his check arrived. Admittedly, the trial court and the examiners had the benefit of hearing and seeing the

---

[2] Appellant testified that currently his rent was $290 per month.

witnesses at the hearing, and it is possible that appellant's demeanor at the hearing caused them to doubt appellant's capability to carry out his plans, but no such findings by the trial court under ORS 426.130(1)(b) appear in the record. Consequently, the evidence preponderates in favor of the proposition that appellant is able to participate in treatment on a voluntary basis despite his mental disorder. Whatever effect his lack of insight will have on his own safety in the future, would seem to be more appropriately addressed by his own medical provider.

Finally, the statute requires us to determine whether appellant "will probably participate" in a voluntary treatment plan. That requirement imposes a subjective standard that requires us to draw inferences from objective facts, or the lack of objective facts, in the record. Initially, we note no indication by appellant in his testimony of any unwillingness to participate in a voluntary treatment plan. Appellant also denied that he had ceased to take his medication before becoming involved in the altercations that led to this proceeding, although there is conflicting evidence in that respect. In appellant's assessment of his need for future treatment, he testified,

> "I just have to get back to my main doctor * * * she knows how my innards work. She can say, [M. C. M.], this is the right meds for you, because you seem to have such and such and such and such happen to you. That's why I value her wisdom, her encouragement, and her dignity."

Once again, we are left without any findings made on the record from which we could find that appellant's expressed intentions are not credible. Finally, we observe that the state does not expressly address this issue either, apparently handicapped by the record in the same way that we are.[3]

---

[3] In ORS 426.130(1)(b), the legislature has expressed a policy that mentally ill persons not be involuntarily committed if they are willing and able to participate in treatment on a voluntary basis and probably will do so. The providing of efficacy to that policy and of meaningful *de novo* review by this court of involuntary commitments by trial courts is facilitated by trial courts making a record that addresses the statutory criteria imposed by the legislature for involuntary mental commitments and the evidence pertinent to those criteria. In some cases involving involuntary mental commitments, we can infer from a *de novo* review of the evidence that the mentally ill person suffers from a mental disorder so acute in effect as to render that person incapable of seeking voluntary treatment. In our view, the evidence in this case does not warrant drawing such an inference.

For all of the above reasons, the evidence preponderates in favor of the conclusion that appellant is willing and able to seek voluntary treatment for his mental disorder and probably will do so. Consequently, we conclude that the trial court was required to dismiss this proceeding under ORS 426.130(1)(b).

Reversed.